[No. S020465. Sept. 9, 1993.]

GERALD D. MIRKIN et al., Plaintiffs and Appellants, v.
FRED W. WASSERMAN et al., Defendants and Respondents.

## Counsel

Milberg, Weiss, Bershad, Specthrie & Lerach, William S. Lerach, Erick A. Isaacson, Blake M. Harper, Helen J. Hodges, Leonard B. Simon, Barrack, Rodos & Bacine, Edward M. Gergosian, Thomas M. Wilson, Leonard Barrack, Wolf, Haldenstein, Adler, Freeman & Herz, Daniel W. Krasner, Jeffrey G. Smith, Francis M. Gregorek, Wechsler, Skirnick, Harwood, Halebian & Feffer, Stuart D. Wechsler, Kohn, Savett, Klein & Graf, Savett, Frutkin, Podell & Ryan, Stuart Savett, Diane Nast, Barbara Podell and Alvin Ivers for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Susan E. Henrichsen, Deputy Attorney General, David B. Gold, Paul F. Bennett, Steven O. Sidener, Jonathan W. Cuneo, Dan McCorquodale, Greenfield & Chimicles and Brenda M. Nelson as Amici Curiae on behalf of Plaintiffs and Appellants.

Paul, Hastings, Janofsky & Walker, Orrick, Herrington & Sutcliffe, William B. Campbell, Todd E. Gordinier, Elizabeth W. Sachs, Bruce D. Ryan, Maryanne B. Haller, C. Dana Hobart, Ernst & Young, Carl D. Liggio, Richard W. McLaren, Jr., Kathryn A. Oberly, Nagler & Schneider, Nagler & Rebhuhn, Lawrence H. Nagler, Larry Goldberg, Harry Rebhuhn, Dennis Berkbigler, Irell & Manella, Morgan Chu, Marjorie Nieset Neufeld, Gibson, Dunn & Crutcher, Richard P. Levy, Donald J. Schmid, Cooper & Dempsey, Michael D. Dempsey, Stephen C. Johnson and Robert D. Donaldson for Defendants and Respondents.

Peter D. Zeughauser, Fred Main, Luce, Forward, Hamilton & Scripps, Charles A. Bird, Charles A. Danaher, Pettit & Martin, John L. Boos, Dennis P. Scott, Orrick, Herrington & Sutcliffe, W. Reece Bader, Barbara Moses, Robert S. Miller, Kindel & Anderson, Robert K. Baker, Dale S. Fischer,

Louis W. Karlin, Fried, Frank, Harris, Shriver & Jacobson, Molly Munger, Cooley, Godward, Castro, Huddleson & Tatum, Patrick J. Mahoney, Ray M. Aragon, Gwen C. Mathewson and Joseph A. Grundfest as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**PANELLI, J.**—We granted review to determine whether plaintiffs, who purchased securities at a price allegedly affected by misrepresentations, can plead a cause of action for deceit under Civil Code sections 1709 and 1710 without alleging that they actually relied on the misrepresentations. We hold that plaintiffs may not do so.

### I. FACTS

This case, which comes to us after the superior court sustained defendants' demurrer, presents a pure question of law. The material allegations of the complaint, which we assume to be true for the purpose of reviewing such rulings (*Garcia* v. *Superior Court* (1990) 50 Cal.3d 728, 732 [268 Cal.Rptr. 779, 789 P.2d 960]), can be summarized briefly:

Plaintiffs Gerald Mirkin and Charles Miller purchased shares of the common stock of Maxicare Health Plans, Inc. (Maxicare) between October 17, 1985, and February 29, 1988. Plaintiffs purport to represent all persons who purchased the company's common stock or its 11.75 percent senior subordinated notes during the same period of time. Defendants are Maxicare, which owned and operated health maintenance organizations in 14 states, including California; 12 of Maxicare's officers and directors; Ernst & Whinney (succeeded by respondent Ernst & Young), the accounting firm that audited Maxicare's financial statements; and Salomon Brothers, Inc. and Montgomery Securities, Inc., who together underwrote public offerings of Maxicare securities on November 26, 1985, and September 19, 1986.

Plaintiffs allege that Maxicare, after appearing to experience substantial growth and profits in 1985 and 1986, began to suffer large losses. Maxicare reported losses of $22 million for the fourth quarter of 1986, $255 million for the year 1987, and $21.3 million for the first quarter of 1988. During this period, the value of Maxicare stock gradually dropped from a high of $28.50 per share in 1986 to a low of $1.50 per share in 1988.

Plaintiffs also allege that defendants, beginning in 1985, made numerous misrepresentations about Maxicare's prospects and financial status in prospectuses for the 1985 and 1986 public offerings, in documents filed with

the Securities Exchange Commission, and in other public communications. According to plaintiffs, these misrepresentations inflated the price of Maxicare securities, thus allowing them to sell for more than their true value. Plaintiffs also allege that several of the individual defendants sold Maxicare securities to the public during the same period of time.

Plaintiffs' first consolidated amended complaint purported to state causes of action for deceit and negligent misrepresentation.[1] (Civ. Code, §§ 1709, 1710.) In attempting to plead actual reliance, which is an element of those torts (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108 [252 Cal.Rptr. 122, 762 P.2d 46]; *Garcia* v. *Superior Court, supra,* 50 Cal.3d at p. 737), plaintiffs alleged in conclusory fashion that they had purchased Maxicare securities "in reliance upon said misrepresentations." Defendants demurred on the ground that the allegation of reliance was insufficient. When plaintiffs conceded they could not plead that they had actually read or heard the alleged misrepresentations, the court sustained the demurrers with leave to amend.

Plaintiffs attempted to cure the defect in an amended complaint by alleging that they had purchased shares "[i]n reliance upon the integrity of the securities market and the securities offering process, and the fidelity, integrity and superior knowledge of defendants . . . ." Once again finding plaintiffs' pleading of reliance deficient, the court sustained defendants' demurrers without leave to amend and dismissed the complaint.

On appeal, plaintiffs argued that the so-called "fraud-on-the-market" doctrine obviates the need to plead and prove actual reliance in cases where material misrepresentations are alleged to have affected the market price of stock. (See generally *Basic Inc.* v. *Levinson* (1988) 485 U.S. 224, 241-247 [99 L.Ed.2d 194, 214-218, 108 S.Ct. 978].) The Court of Appeal rejected the argument and affirmed the judgment of the superior court. We granted review.

## II. Discussion

■ It is settled that a plaintiff, to state a cause of action for deceit based on a misrepresentation, must plead that he or she actually relied on the misrepresentation. (E.g., *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1108; *Seeger* v. *Odell* (1941) 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]; *Spinks* v. *Clark* (1905) 147 Cal. 439, 444 [82 P. 45].) The law appears

---

[1]Plaintiffs also attempted to state a cause of action under Corporations Code section 1507 [false reports by corporations], but have not challenged the Court of Appeal's decision insofar as it rejects that claim. We thus deem the claim to have been abandoned.

always to have been so in this state. (See, e.g., *Colton* v. *Stanford* (1890) 82 Cal. 351, 383 [23 P. 16]; *Nounnan* v. *Sutter County Land Co.* (1889) 81 Cal. 1, 6-7 [22 P. 515]; *Estep* v. *Armstrong* (1886) 69 Cal. 536, 538 [11 P.2d 132]; *Snow* v. *Halstead* (1851) 1 Cal. 359, 361.)

 ██ ██ The question before us is whether plaintiffs, who cannot allege that they actually read or heard the alleged misrepresentations, have pled a cause of action for deceit.[2] Rather than relying on defendants' statements about Maxicare and the value of its securities, plaintiffs allege that they "reli[ed] on the integrity of the securities market and the securities offering process, and the fidelity, integrity and superior knowledge of defendants . . . ." To justify their failure to plead actual reliance on the alleged misrepresentations, plaintiffs explain that the price of securities traded in an open and developed market, such as a national stock exchange, adjusts in response to material information, whether such information is true or false. In this way, plaintiffs assert, misrepresentations are reflected in the market price of a security, and someone who relies on the market price as indicating the actual value of a security relies, albeit indirectly, on the misrepresentations.

Based on this reasoning, which is sometimes called the fraud-on-the-market doctrine, the United States Supreme Court has held that "[i]t is not inappropriate to apply a presumption of reliance" in actions brought under rule 10b-5 of the Securities and Exchange Commission (SEC). (*Basic Inc.* v. *Levinson, supra,* 485 U.S. at pp. 241-247, 250 [99 L.Ed.2d at pp. 214-218; 220; see SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (1992) [hereafter Rule 10b-5].)

██ The characteristics of a private action under Rule 10b-5 are not derived from, or identical to, the common law of deceit. Rule 10b-5 was promulgated by the SEC under a broad, statutory grant of authority to adopt rules to prevent the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. (Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b)).) This enabling legislation was intended by Congress to be interpreted " 'flexibly to effectuate its remedial purposes.' " (*Affiliated Ute Citizens* v. *United States* (1972) 406 U.S. 128, 151 [31 L.Ed.2d 741, 760, 92 S.Ct. 1456], quoting *Supt. of Insurance* v. *Bankers Life & Cas. Co.* (1971) 404 U.S. 6, 12 [30 L.Ed.2d 128, 134, 92 S.Ct. 165].) Under this broad charter, the federal courts "have gone

---

[2]Although we do not separately discuss plaintiffs' claim for negligent misrepresentation, our conclusions apply equally thereto. Negligent misrepresentation, which the Civil Code defines as a form of deceit (Civ. Code, §§ 1709, 1710, subd. (2)), requires plaintiffs to plead and prove actual reliance just as in a claim for intentional misrepresentation. (*Garcia* v. *Superior Court, supra,* 50 Cal.3d at p. 737 & fn. 7.)

far beyond the limits of the common law in imposing liability under [Rule] 10b-5 . . . ." (*Green* v. *Wolf Corporation* (2d Cir. 1968) 406 F.2d 291, 303 [9 A.L.R.Fed. 100].) As a result, "[a]ctions under Rule 10b-5 are distinct from common-law deceit and misrepresentation claims [citation], and are in part designed to add to the protections provided investors by the common law [citation]." (*Basic Inc.* v. *Levinson, supra*, 485 U.S. at p. 244, fn. 22 [99 L.Ed.2d at p. 216]; see also *Blackie* v. *Barrack* (9th Cir. 1975) 524 F.2d 891, 907.)

 Plaintiffs' argument to this court amounts, in essence, to a plea to incorporate the fraud-on-the-market doctrine into the common law of deceit. No state appellate court has done so, as plaintiffs concede.[3] Nor is it necessary to do so in order to create a remedy for an unremedied wrong, or even to give plaintiffs the benefit of the doctrine they seek to apply. Plaintiffs already have remedies under the federal and state securities laws, both of which afford a presumption of reliance in actions based on material misrepresentations. (See Rule 10b-5, as interpreted in *Basic Inc.* v. *Levinson, supra*, 485 U.S. at pp. 241-247, 250 [99 L.Ed.2d at pp. 214-218, 220]; see also Corp. Code, §§ 25400 & 25500, as interpreted in *Bowden* v. *Robinson* (1977) 67 Cal.App.3d 705, 714 [136 Cal.Rptr. 871].) Indeed, the parties

---

[3]Plaintiffs have identified a single, unpublished order by a Colorado trial court applying the fraud-on-the-market doctrine to common law fraud claims.

For state court decisions declining to apply the fraud-on-the-market doctrine, see *Gaffin* v. *Teledyne, Inc.* (Del. 1992) 611 A.2d 467, 474-475, and *Kahler* v. *E.F. Hutton & Co.* (Fla.Dist.Ct.App. 1990) 558 So.2d 144, 145. See also *Peil* v. *Speiser* (3d Cir. 1986) 806 F.2d 1154, 1163, fn. 17 [93 A.L.R.Fed. 419] ("no state courts have adopted the [fraud-on-the-market] theory, and thus direct reliance remains a requirement of a common law securities fraud claim").

In recent opinions, the lower federal courts in California have followed the Court of Appeal's opinion in this case by declining to apply the fraud-on-the-market doctrine to fraud claims arising under state common law. (*In re Sunrise Technologies Sec. Lit.* (N.D.Cal. 1992) [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,042; *In re Sun Microsystems Sec. Lit.* (N.D.Cal. 1992) [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,916; *In re Keegan Management Co. Sec. Lit.* (N.D.Cal. 1991) [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,275; *In re Software Toolworks, Inc. Sec. Lit.* (N.D. Cal. 1991) [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,425; *Church* v. *Consolidated Freightways, Inc.* (N.D.Cal. 1991) [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,162; *Antonopulos* v. *American Thoroughbreds, Inc.* (N.D.Cal. 1991) [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,057.)

Earlier, the federal courts had split on the issue as they attempted to predict how this court would decide it. Compare cases rejecting the fraud-on-the-market doctrine, e.g., *Cytryn* v. *Cook* (N.D.Cal. 1990) [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,409, *Victor* v. *White* (N.D.Cal. 1989) [1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,548, and *In re Technical Equities Litigation* (N.D.Cal. 1988) [1988-1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,093, with cases applying the doctrine, albeit provisionally, at the stage of class certification, e.g., *In re Worlds of Wonder Securities Litigation* (N.D.Cal. 1990) [1989-1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,004, *In re ZZZZ Best Securities Litigation* (C.D.Cal. 1989) [1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,485, and *Weinberger* v. *Jackson* (N.D.Cal. 1984) 102 F.R.D. 839.

inform us that a class action on behalf of Maxicare's investors under Rule 10b-5 has been filed in federal court. (Zucker, et al. v. Maxicare Health Plans, Inc., et al. (C.D.Cal.) Dock. No. CV-88-02499.) Nevertheless, to establish a presumption of reliance under state common law would offer plaintiffs certain advantages, primarily a more favorable statute of limitations and the possibility of recovering punitive damages—a form of relief that the federal and state securities laws do not authorize.

To obtain these advantages, plaintiffs argue that California law already affords a presumption of reliance in actions for deceit. Plaintiffs also contend that, if the law does not afford such a presumption, we should adopt one at this time as a matter of policy. We find both arguments unpersuasive.

### A. *The Law of Deceit.*

#### 1. *The Requirement of Actual Reliance.*

■ Plaintiffs begin their argument by observing that the statutes pertaining to the tort of deceit (Civ. Code, §§ 1709, 1710) do not expressly require a showing of actual reliance. This leads plaintiffs to the conclusion that reliance, in California, is merely one method of proving causation, which, they contend, can be pled by alleging that defendants' misrepresentations had the purpose and effect of causing plaintiffs to purchase or to sell, whether or not such misrepresentations ever came to plaintiffs' attention.

It is true that the relevant statutes do not expressly mention the element of reliance. Civil Code section 1709 provides only that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Nor is there any mention of reliance in Civil Code section 1710, which offers three definitions of "deceit" that may pertain to this case: "1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; [and] [¶] 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . ."

However, like much of our law, the law of deceit in California is not purely statutory; it is a mixture of statutory and common law. Provisions of the Civil Code that are substantially the same as the common law, such as the provisions that codify common law torts, "must be construed as continuations thereof, and not as new enactments." (Civ. Code, § 5.) Civil Code sections 1709 and 1710 have been recognized as continuations of the

common law. (*Lacher* v. *Superior Court* (1991) 230 Cal.App.3d 1038, 1043, fn. 1 [281 Cal.Rptr. 640].) Thus, it is entirely consistent with those statutes that California courts have always required plaintiffs in actions for deceit to plead and prove the common law element of actual reliance. (E.g., *Molko* v. *Holy Spirit Assn.*, *supra*, 46 Cal.3d at p. 1108; *Seeger* v. *Odell*, *supra*, 18 Cal.2d at p. 414; *Spinks* v. *Clark*, *supra*, 147 Cal. at p. 444; *Colton* v. *Stanford*, *supra*, 82 Cal. at p. 383; *Nounnan* v. *Sutter County Land Co.*, *supra*, 81 Cal. at pp. 6-7; *Estep* v. *Armstrong*, *supra*, 69 Cal. at p. 538; *Snow* v. *Halstead*, *supra*, 1 Cal. at p. 361.) It may be true, as plaintiffs assert, that reliance can be thought of as the mechanism of causation in an action for deceit. (Cf. *Garcia* v. *Superior Court*, *supra*, 50 Cal.3d at p. 737.) But to accept that characterization does not excuse plaintiffs from the requirement of pleading reliance, since specific pleading is necessary to "establish a complete causal relationship" between the alleged misrepresentations and the harm claimed to have resulted therefrom. (*Ibid.*)

Nor does Civil Code section 1711, on which plaintiffs also rely, obviate the need to plead or prove reliance. The section provides that "[o]ne who practices a deceit with intent to defraud the public, or a particular class of persons, is deemed to have intended to defraud every individual in that class, who is actually misled by the deceit." To the extent it may be relevant here, the statute simply points out that one who makes false representations with fraudulent intent need not have any particular victim in mind. Litigants who rely on section 1711 must still plead and prove actual reliance. (See *Slakey Brothers Sacramento, Inc.* v. *Parker* (1968) 265 Cal.App.2d 204, 207-210 [71 Cal.Rptr. 269] [pleading of reliance insufficient]; cf. *Wennerholm* v. *Stanford University Sch. of Med.* (1942) 20 Cal.2d 713, 716-717 [128 P.2d 522, 141 A.L.R. 1358] [pleading sufficient]; *Block* v. *Tobin* (1975) 45 Cal.App.3d 214, 219 [119 Cal.Rptr. 288] [same]; see also *Schell* v. *Schmidt* (1954) 126 Cal.App.2d 279, 287-289 [272 P.2d 82] [proof of reliance insufficient]; cf. *Nathanson* v. *Murphy* (1955) 132 Cal.App.2d 363, 369-370 [282 P.2d 174] [proof sufficient].)

Plaintiffs argue that to require the pleading and proof of actual reliance would render another provision of the Civil Code meaningless. The provision in question, section 3343, defines the measure of damages for "[o]ne defrauded in the purchase, sale or exchange of property . . . ." The ordinary measure of damages in such cases is "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction . . . ." (Civ. Code, § 3343, subd. (a).) However, lost profits are also available when "[t]he defrauded party reasonably relied on the fraud in entering into the transaction and in anticipating profits from the subsequent use or sale of the property." (*Id.*, § 3343, subd. (a)(4)(ii).)

Plaintiffs argue that the statute's "reliance requirement for additional damages would be meaningless if . . . actual subjective reliance were required in all fraud cases." The argument might have merit if the statute said only that the defrauded party must have "reasonably relied on the fraud in entering into the transaction." However, that is only one of the statutory prerequisites for recovery of lost profits; read in full, the statute provides that lost profits are available only when the defrauded party "reasonably relied on the fraud in entering into the transaction *and in anticipating profits from the subsequent use or sale of the property.*" (Civ. Code, § 3343, subd. (a)(4)(ii), italics added.) Obviously, one can purchase property in a fraudulent transaction without anticipating profit from the property's use or resale. Therefore, the statute cannot plausibly be read as eliminating the element of reliance from the tort of deceit.

Finally on this point, plaintiffs argue that actual reliance cannot logically be an element of a cause of action for deceit based on an omission because it is impossible to demonstrate reliance on something that one was not told. In support of the argument, plaintiffs cite *Affiliated Ute Citizens* v. *United States, supra,* 406 U.S. 128 (*Ute*), in which the officers of a bank, which served as the transfer agent for a Native American corporation holding tribal assets, purchased shares from individual members of the tribe in face-to-face transactions without conveying cautionary information their duties required them to convey and without informing the sellers that they, the buyers, were profiting. (*Id.* at pp. 150-154 [31 L.Ed.2d at pp. 759-762].) Interpreting Rule 10b-5, the high court held that "positive proof of reliance is not a prerequisite to recovery" in a case "involving primarily a failure to disclose . . . ." (406 U.S. at p. 153 [31 L.Ed.2d at p. 761].)

We see no reason to adopt the *Ute* presumption as California law. Contrary to plaintiffs' assertion, it is not logically impossible to prove reliance on an omission. One need only prove that, had the omitted information been disclosed, one would have been aware of it and behaved differently. Moreover, as we shall explain below, the body of law that has developed under Rule 10b-5 is not sufficiently analogous to the law of fraud to justify its importation into the latter.[4]

---

[4]It also deserves mention that federal courts have identified two serious practical problems created by the *Ute* presumption. First, "through clever pleading, 'every fraud case based on material misrepresentation [can] be turned facilely into a material omissions case.'" (*Gruber* v. *Price Waterhouse* (E.D.Pa. 1991) 776 F.Supp. 1044, 1050, quoting *Beck* v. *Cantor, Fitzgerald & Co.* (N.D.Ill. 1985) 621 F.Supp. 1547, 1556.)

Second, the *Ute* presumption makes it difficult to allocate the burden of proof in cases that involve both misrepresentations and omissions. For this reason, the federal courts do not uniformly apply the presumption in such cases. Compare opinions holding the *Ute*

## 2. *Decisions Permitting a Class-wide Inference of Reliance.*

In two cases involving consumer class actions we held that it would be appropriate to infer that each member of a class had actually relied on the defendant's alleged misrepresentations. (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 814-815 [94 Cal.Rptr. 796, 484 P.2d 964] [*Vasquez*]; *Occidental Land, Inc.* v. *Superior Court* (1976) 18 Cal.3d 355, 362-363 [134 Cal.Rptr. 388, 556 P.2d 750] [*Occidental Land*].) The plaintiffs in each case specifically pled that the defendants had made identical representations to each class member. Accordingly, these decisions do not support an argument for presuming reliance on the part of persons who never read or heard the alleged misrepresentations, such as plaintiffs in the case before us.

The plaintiffs in *Vasquez, supra,* 4 Cal.3d 800, who had purchased frozen food and freezers on installment contracts, alleged that the sellers had misrepresented the price and value of the merchandise. We held that the plaintiffs had adequately pled actual reliance and that the action could properly be maintained as a class action. We reached these conclusions because plaintiffs had pled actual reliance on an individual basis and because reliance, under the peculiar facts of the case, was truly a common issue. This was because plaintiffs asserted that "they [could] demonstrate [that the] misrepresentations were in fact made to each class member without individual testimony because the salesmen employed by [the defendant seller] memorized a standard statement containing the representations (which in turn were based on a printed narrative and sales manual) and that this statement was recited by rote to every member of the class." (*Id.* at pp. 811-812.)

The facts of *Occidental Land, supra,* 18 Cal.3d 355, are similar. The plaintiffs, who had purchased houses in a subdivision developed and sold by the defendant, alleged that the defendant had misrepresented the future cost of maintaining certain common areas. Relying on *Vasquez, supra,* 4 Cal.3d 800, we held that actual reliance was a common issue and that the trial court thus did not abuse its discretion by certifying the action as a class action. We reached this conclusion because, as in *Vasquez*, plaintiffs alleged that the defendant's misrepresentations had actually been made to each member of the class. Indeed, the misrepresentations were contained in a public report,

---

presumption inapplicable whenever the pleadings disclose both misrepresentations and omissions (*Cavalier Carpets, Inc.* v. *Caylor* (11th Cir. 1984) 746 F.2d 749, 753-757, *Sheftelman* v. *Jones* (N.D.Ga. 1987) 667 F.Supp. 859, 867-868, *Beck* v. *Cantor, Fitzgerald & Co., supra,* 621 F.Supp. 1547, 1556-1557), with opinions holding that the burden of proof on the issue of reliance must be determined on a case-by-case basis (*Sharp* v. *Coopers & Lybrand* (3d Cir. 1981) 649 F.2d 175, 186-189, *Gruber* v. *Price Waterhouse, supra,* 776 F.Supp. at pp. 1050-1051).

and "[e]ach purchaser was obligated to read the report and state in writing that he had done so." (*Occidental Land, supra,* 18 Cal.3d p. 358; see also *id.* at pp. 359, 363.)

Plaintiffs, who rely heavily on *Vasquez* and *Occidental Land,* misinterpret those decisions. Plaintiffs argue that we "held that pleading and proof of direct reliance by each victim of a fraud are not required where material misrepresentations are alleged" and that, in the absence of actual reliance, reliance may be pled "by the equivalent of the fraud-on-the-market doctrine, i.e., material misrepresentations to the class, plus action consistent with reliance thereon." In fact, we held no such thing. ▮ What we did hold was that, *when the same material misrepresentations have actually been communicated to each member of a class,* an inference of reliance arises as to the entire class. (*Vasquez, supra,* 4 Cal.3d at p. 814 & fn. 9; *Occidental Land, supra,* 18 Cal.3d at pp. 358, 359, 363.) While this does mean that actual reliance can be proved on a class-wide basis when each class member has read or heard the same misrepresentations, nothing in either case so much as hints that a plaintiff may plead a cause of action for deceit without alleging actual reliance.

### 3. *Indirect Communication Cases.*

Plaintiffs next argue that they need not, in order to state a cause of action for deceit, plead that the alleged misrepresentations were communicated to them directly by defendants. Instead, according to plaintiffs, indirect communication suffices. While the principle is valid, it does not help these plaintiffs, who cannot plead that the alleged misrepresentations ever came to their attention.

▮ The Restatement Second of Torts section 533, articulates the relevant principle in this way: "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transactions involved." A few cases in this state expressly apply section 533 (*Varwig* v. *Anderson-Behel Porsche/Audi, Inc.* (1977) 74 Cal.App.3d 578, 581 [141 Cal.Rptr. 539]; *Barnhouse* v. *City of Pinole* (1982) 133 Cal.App.3d 171, 191 [183 Cal.Rptr. 881]), and several cases that predate section 533 apply the principle that the section restates (*American T. Co.* v. *California etc. Ins. Co.* (1940) 15 Cal.2d 42, 67 [98 P.2d 497]; *Crystal Pier Amusement Co.* v. *Cannan* (1933) 219 Cal. 184, 188 [25 P.2d 839, 91 A.L.R. 1357];

*Hunter* v. *McKenzie* (1925) 197 Cal. 176, 185 [239 P. 1090]; *Massei* v. *Lettunich* (1967) 248 Cal.App.2d 68, 73 [56 Cal.Rptr. 232]; *Harold* v. *Pugh* (1959) 174 Cal.App.2d 603, 608-609 [345 P.2d 112]; *Simone* v. *McKee* (1956) 142 Cal.App.2d 307, 313-314 [298 P.2d 667]; *Nathanson* v. *Murphy*, *supra*, 132 Cal.App.2d 363, 368; *Wice* v. *Schilling* (1954) 124 Cal.App.2d 735, 745 [269 P.2d 231]; *Strutzel* v. *Williams* (1952) 109 Cal.App.2d 512, 515 [240 P.2d 988].)

These cases offer plaintiffs no assistance. As the language of the Restatement indicates, a plaintiff who hears an alleged misrepresentation indirectly must still show "justifiable reliance upon it . . . ." (Rest.2d Torts, § 533.)[5] The need to show reliance is confirmed by the opinions in this state addressing claims for deceit based on indirect communications.

The plaintiff in *Varwig* v. *Anderson-Behel Porsche/Audi, Inc.*, *supra*, 74 Cal.App.3d 578 (*Varwig*), purchased an automobile from a used car dealer who claimed to have clear title. The claim proved to be erroneous when a lienholder repossessed the car. Plaintiff sued both the seller and the seller's seller, who was also an automobile dealer. The trial court granted the latter's motion for summary judgment, but the Court of Appeal reversed. Based on the circumstances of the transaction between the two dealers, which contemplated the car's eventual resale to a consumer, the court found an implicit, and fraudulent, representation by the selling dealer that the buying dealer was receiving a transferable title. Because it was foreseeable that the buying dealer would repeat the misrepresentation, the court held that the false claim of title was "in law an indirect misrepresentation to plaintiff, who purchased the car in reliance upon [the seller's] repetition of the representation." (*Id.* at p. 581.)

The facts of *Barnhouse* v. *City of Pinole*, *supra*, 133 Cal.App.3d 171 (*Barnhouse*), are similar. The defendant, a property developer, built houses on landfill in the bed of a diverted stream. The buyers knew that the houses stood on fill but were told that the developer had taken remedial measures recommended by an engineer. The buyers did not know that the developer had not followed the engineer's plan or that there were other soil and drainage problems. One buyer resold his house to the plaintiff, who sued the developer for deceit. The trial court granted the developer's motion for a nonsuit. The Court of Appeal reversed. Following *Varwig*, *supra*, 74

---

[5]For this reason, plaintiffs derive no assistance from a comment in the Restatement indicating that a person who makes a misrepresentation to a credit agency in order to obtain a favorable credit rating is liable to persons who rely on the agency's report. (Rest.2d Torts, § 533, com. (f).) While the misrepresentation in such a case need not be communicated verbatim, the defendant is liable only to a plaintiff "who acts in justifiable reliance upon it . . . ." (*Id.*, § 533.)

Cal.App.3d 578, and the Restatement Second of Torts, section 533, the court reasoned that the plaintiff had indirectly relied on the developer's incomplete representations to the original buyers. As in *Varwig*, the defendant had reason to expect that there would be subsequent purchasers and that the original buyers would repeat the defendant's fraudulently incomplete representations about the property. (*Barnhouse, supra,* 133 Cal.App.3d at pp. 191-193.)

 These decisions do not support plaintiffs' position in this case. To say that a plaintiff who relies on secondhand misrepresentations can state a cause of action for deceit is not to say that reliance may be presumed, as plaintiffs contend. Certainly one finds no support for a presumption of reliance in *Varwig* and *Barnhouse,* in which the plaintiffs received the same misleading communications that the original purchasers had received from the defendants.

 Nor do the decisions that preceded section 533 of the Restatement Second of Torts suggest that reliance can be presumed. Indeed, each decision expressly holds that actual reliance is required. The rule is typically stated in such language as this: " 'A representation made to one person with the intention that it shall reach the ears of another, and be acted upon by him, *and which does reach him, and is acted upon by him to his injury,* gives the person so acting upon it the same right to relief or redress as if it had been made to him directly.' " (*Crystal Pier Amusement Co.* v. *Cannan, supra,* 219 Cal. at p. 188, quoting *Henry* v. *Dennis* (1901) 95 Me. 24 [49 A. 58, 60] [italics added]; see also *American T. Co.* v. *California etc. Ins. Co., supra,* 15 Cal.2d at p. 67; *Hunter* v. *McKenzie, supra,* 197 Cal. at p. 185; *Massei* v. *Lettunich, supra,* 248 Cal.App.2d at p. 73; *Harold* v. *Pugh, supra,* 174 Cal.App.2d at pp. 608-609; *Simone* v. *McKee, supra,* 142 Cal.App.2d at pp. 313-314; *Nathanson* v. *Murphy, supra,* 132 Cal.App.2d at p. 368; *Wice* v. *Schilling, supra,* 124 Cal.App.2d at p. 745; *Strutzel* v. *Williams, supra,* 109 Cal.App.2d at p. 515.)

In a few cases, courts in this state have found liability under the common law for misrepresentations not actually communicated to the plaintiff. These cases do not assist these plaintiffs, however, because the courts that decided the cases expressly relied on agency principles rather than the concept of a fraud on the market. (*Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 441 [79 Cal.Rptr. 369] [*Grinnell*]; *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 707 [60 Cal.Rptr. 398, 29 A.L.R.3d 988] [*Toole*]; *Roberts* v. *Salot* (1958) 166 Cal.App.2d 294, 301 [333 P.2d 232] [*Roberts*].) *Grinnell* and *Toole* were suits against pharmaceutical manufacturers brought by plaintiffs who had suffered product-related injuries.

The court in each case held that the plaintiffs, who had not read or heard the manufacturers' representations, could nevertheless sue for breach of express warranty because the physicians who administered the pharmaceuticals did rely on the representations and, in doing so, had acted as the plaintiffs' agents. (*Grinnell, supra,* 274 Cal.App.2d at p. 441; *Toole, supra,* 706 Cal.App.2d at p. 707.) Similarly, the court in *Roberts, supra,* 166 Cal.App.2d 294, a case in which a lender made misrepresentations to a property owner's "agent," simply held that "[a] fraud worked upon [the agent] by misrepresentation or by silence was worked upon her principal and he has a right of action for redress." (*Id.* at p. 300.)

 Plaintiffs also rely on the opinion in *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197 [197 Cal.Rptr. 783, 673 P.2d 660] (*Children's Television*). The case involved a complaint against entities involved in the manufacturing and advertising of sugared breakfast cereals intended for children. The plaintiffs alleged, among other things, that the defendants fraudulently represented that consumption of their products benefited a child's health. The trial court sustained defendants' demurrers to the complaint. On appeal, the defendants argued that the plaintiffs had not adequately pled reliance on the alleged misrepresentations because "one group, children, [had] receive[d] the misrepresentations and a different group, parents, [had] purchase[d] the product." (*Id.* at p. 219.)

The court disposed of defendants' objection in a single, enigmatic sentence whose interpretation has spawned considerable debate. To avoid paraphrasing the language in a way that might unintentionally fuel the debate, we shall quote the sentence, as well as the paragraph it concludes, in full:

"Restatement Second of Torts section 533, states that '[t]he maker of a fraudulent misrepresentation is subject to liability . . . to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct.' This proposition was [e]ndorsed as California law in *Varwig* [*supra,* 74 Cal.App.3d at p. 581]. We recognize that it does not quite cover the present case—plaintiffs do not allege the children repeated the representations to their parents, and we would imagine that in most cases they did not, but simply expressed their desire for the product. *Repetition, however, should not be a prerequisite to liability; it should be sufficient that defendant makes a misrepresentation to one group intending to influence the behavior of the ultimate purchaser, and that he succeeds in this plan.*" (*Children's Television, supra,* 35 Cal.3d at p. 219, italics added.)

Plaintiffs read *Children's Television* as adopting, albeit not in so many words, the fraud-on-the-market doctrine. According to plaintiffs, "*Children's Television* recognizes that reliance is sufficiently pled if it is alleged that the defendant made misrepresentations to the marketplace, or a segment of it, 'intending to influence the behavior of the ultimate purchaser, and that he succeeds in this plan.' " We do not believe, however, that *Children's Television* supports such a proposition. If the court had actually intended to announce such a drastic change to settled law on a point as important as the nature of reliance in an action for deceit, one would expect to see the announcement of the new rule to be supported with reasons and the citation of authority. Instead, one finds only a single sentence, unsupported by reasoning or authority and phrased in tentative language: "Repetition . . . should not be a prerequisite to liability . . . ." (35 Cal.3d at p. 219.)

Under these circumstances, we cannot responsibly read *Children's Television* the way plaintiffs would have us read it if there is a narrower interpretation that is consistent with the holding of the case. Indeed, there is such an interpretation. The court's reference to section 533 of the Restatement Second of Torts and *Varwig, supra,* 74 Cal.App.3d 578, even though the court noted that the principle stated in those authorities "d[id] not quite cover the present case" (35 Cal.3d at p. 219), strongly indicates that the holding was based on the idea of an indirect representation. Rather than speculate that the court intended to adopt the fraud-on-the-market doctrine sub silentio, one stays closer to the actual language of the opinion by reading it as recognizing, simply, that children cannot be expected to convey representations about products with precision. Indeed, the opinion says exactly this in explaining why the plaintiffs did not need to set out in their complaint the precise language of each allegedly false advertisement: "Children in particular are unlikely to recall the specific advertisements which led them to desire a product . . . ." (*Ibid.*)

Nor do plaintiffs derive much support from another decision on which they heavily rely, *In re Equity Funding Corp. of Amer. Sec. Litigation* (C.D.Cal. 1976) 416 F.Supp. 161 (opn. by Lucas, J.) (*Equity Funding*). It is true that the federal court in that case denied defendants' motion to dismiss a claim for common law deceit in a securities fraud action and that the complaint, judging from its description in the opinion, did not appear to allege actual reliance by each plaintiff. Instead, plaintiffs alleged that defendants had disseminated false statements " 'for the purpose and effect of influencing and manipulating the price of Equity Funding securities and for the purpose and with the effect of influencing open market purchasers of [the] securities to purchase such securities.' " (*Id.* at p. 182.)

We do not read the opinion in *Equity Funding* as purporting to adopt the fraud-on-the-market theory as a matter of state law, for several reasons.

First, in discussing the adequacy of the plaintiffs' claim for deceit the court did not even mention the theory, let alone suggest an intent to adopt it. The court said only that the plaintiffs' "allegation of 'purpose and effect,' coupled with the clear materiality of the misrepresentations alleged, satisfies the reliance and causation requirements imposed on pleadings that assert fraud claims in California." (*Equity Funding, supra,* 416 F.Supp. at p. 183.) Second, the fraud-on-the-market doctrine was not well established in the federal system at the time. The opinion generally cited as introducing the doctrine, *Blackie* v. *Barrack, supra,* 524 F.2d 891, preceded the *Equity Funding* decision by only four months and was not cited in the latter. Indeed, it has been observed that widespread acceptance of the doctrine in the lower federal courts cannot be placed any earlier than 1982 or 1983. (*Basic Inc.* v. *Levinson, supra,* 485 U.S. at pp. 250-251, fn. 1 [99 L.Ed.2d at p. 220] (conc. & dis. opn. of White, J.).) Third, and most importantly, it was not the federal court's role to effect changes in state law. (*Erie R. Co.* v. *Tompkins* (1938) 304 U.S. 64 [82 L.Ed. 1188, 58 S.Ct. 817].) It is, thus, unrealistic to construe the court's opinion as purporting or intending to do so.[6]

### B. *Should the Law Be Changed?*

 Having determined that California law does not permit plaintiffs to state a cause of action for deceit without pleading actual reliance, we next consider plaintiffs' arguments for changing the law by incorporating the fraud-on-the-market doctrine.

Plaintiffs first argue that the proposed change is necessary to provide a remedy for victimized investors. It is unfair, plaintiffs contend, to require

---

[6]The dissent argues that the majority "restricts the concept of indirect reliance" by not extending it to cases in which the plaintiff knows nothing about the securities he is purchasing beyond their market price. According to the dissent, courts have extended liability to "those situations in which an intermediary has conveyed the misrepresentation in the form of a rating, certification, recommendation, or market price." (Dis. opn. of Kennard, J., *post,* p. 1117.)

As we have already explained (see *ante,* pp. 1095-1100), the relevant authorities do not support the dissent's position. Nor does the opinion in *Learjet Corp.* v. *Spenlinhauer* (1st Cir. 1990) 901 F.2d 198 (cited in dis. opn. of Kennard, J., *post,* pp. 1112, 1117-1118), a less clearly relevant case on which the dissent also relies. The federal court in *Learjet,* applying Kansas law, held that the buyer of an airplane had stated a cause of action for fraud based on the allegation that the craft's manufacturer had made certain representations to the Federal Aviation Administration in order to have it certified as airworthy. (901 F.2d at pp. 200-204.)

*Learjet* says nothing about the fraud-on-the-market doctrine, and no court has relied upon that case to justify the doctrine's adoption. Indeed, the case is inapposite. In contrast to a governmental certification, which necessarily implies that the particular representations required to obtain the certification have been made, a market price necessarily implies only that some buyer is willing to pay the quoted price.

pleading and proof of actual reliance because it is widely accepted that stock prices adjust in reaction to material information, whether true or false. Under these circumstances, according to plaintiffs, the requirement of actual reliance merely penalizes investors who have innocently relied on the integrity of the market but cannot demonstrate reliance on a particular misrepresentation.

We do not doubt that stock prices adjust in response to the dissemination of material information.[7] However, it does not follow that investors will be left without a remedy unless we adopt the fraud-on-the-market doctrine. Investors, including plaintiffs in this case, already have remedies under federal and state law that do not require the pleading or proof of actual reliance. ██ ██ Rule 10b-5, which we have already mentioned, affords plaintiffs both a private right of action in federal court and a presumption of reliance. (See Rule 10b-5, as interpreted in *Basic Inc.* v. *Levinson, supra,* 485 U.S. at pp. 241-247 [99 L.Ed.2d at pp. 214-218].)[8] Indeed, as we have also mentioned, a class action lawsuit under Rule 10b-5 based on the same events involved in this case has been filed in federal

---

[7]This statement does not imply acceptance or rejection of the so-called "efficient capital markets hypothesis," which sometimes is invoked to give theoretical support to such statements. (Cf. *Basic Inc.* v. *Levinson, supra,* 485 U.S. at pp. 242, 246 [99 L.Ed.2d at pp. 215, 217-218], fn. 24 [99 L.Ed.2d at pp. 215, 217-218] [adopting a presumption of reliance under Rule 10b-5 but not endorsing any particular economic theory]; *id.* at p. 253 [99 L.Ed.2d at p. 222] (conc. & dis. opn. of White, J.) ["with no staff economists, no experts schooled in the 'efficient-capital-market-hypothesis,' no ability to test the validity of empirical market studies, we are not well equipped to embrace novel constructions of a statute based on contemporary microeconomic theory"].)

[8]The federal courts may be surprised to read in the dissent that they "do *not* employ a presumption of reliance to determine the existence of a cause of action" in fraud-on-the-market cases brought under rule 10b-5. (Dis. opn. of Kennard, J., *post,* p. 1120, italics added; compare *Basic Inc.* v. *Levinson, supra,* 485 U.S. at p. 247 [99 L.Ed.2d at p. 218] ["an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action"].)

It is hard to understand why the dissent asserts that the fraud-on-the-market doctrine does not involve a presumption of reliance. Perhaps the dissent is attempting to play down the significance of its proposal to adopt the doctrine. In any event, the dissent is wrong: The federal courts do presume reliance to determine the existence of a cause of action. Reliance at common law has two components—awareness of the misrepresentation and action based thereon. The plaintiff in a fraud-on-the-market case under Rule 10b-5 is not required to prove the first component. (*Blackie* v. *Barrack, supra,* 524 F.2d at pp. 905-906.) That is one sense in which reliance is presumed. This, of course, is exactly the presumption that the dissent would adopt as part of the common law of deceit. That the dissent chooses not to call it a presumption is of no consequence.

Federal courts in fraud-on-the-market cases under Rule 10b-5 presume reliance in another sense as well. The plaintiff in such a case must prove the second component of common law reliance: that, but for the misrepresentation's effect on the price of the securities, he would not have traded them. Federal courts call this element both "reliance" and "transaction causation," using the terms interchangably. (*McGonigle* v. *Combs* (9th Cir. 1992) 968 F.2d

court. (Zucker, et al. v. Maxicare Health Plans, Inc., et al., *supra*, Dock. No. CV-88-02499.)

 Defrauded investors may also sue under the antifraud provisions of state securities law for misrepresentations that affect the market without proving actual reliance. (See Corp. Code, §§ 25400, 25500.)[9] The very purpose of these statutes is to "afford the victims of securities fraud with a remedy without the formidable task of proving common law fraud." (*Bowden* v. *Robinson, supra*, 67 Cal.App.3d at p. 714.)

Under section 25400, it is unlawful for "a broker-dealer *or other person* selling or offering for sale or purchasing or offering to purchase [a] security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading." (§ 25400, subd. (d), italics added.)

Investors harmed by a violation of section 25400 have an express, private right of action under section 25500, which provides that "[a]ny person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction." (§ 25500.)

Sections 25400 and 25500, as one court has written, "conspicuously avoid [] the requirement of 'actual reliance.'" (*Bowden* v. *Robinson, supra*, 67 Cal.App.3d at p. 714, quoting Olson, *The California Corporate Securities*

810, 821, fn. 10 ["[s]ome courts refer to transaction causation as 'reliance' . . . but this distinction is merely semantic"].)

"Reliance" in the sense of "transaction causation" is also presumed. That, of course, was precisely the holding of *Basic Inc.* v. *Levinson* (*supra*, 485 U.S. at p. 247; see *Malone* v. *Microdyne Corp.* (E.D.Va. 1993) 148 F.R.D. 153, 158 ["[t]ransaction causation, in this sense, is precisely the same thing as 'reliance,' as used in the *Basic* opinion and, therefore, if the 'fraud on the market' theory is found to be applicable, transaction causation must be presumed"]). The defendant may disprove "reliance," in this sense, by showing that the plaintiff would have engaged in the same securities transactions despite the defendant's misrepresentation. However, this does not mean, as the dissent asserts, that a presumption of reliance is not employed to determine the existence of a cause of action. It only means that the presumption is "rebuttable." (*Basic Inc.* v. *Levinson, supra*, 485 U.S. at pp. 248-249, 250 [99 L.Ed.2d at pp. 218-220].)

[9]All further citations to statutes are to the Corporations Code unless otherwise noted.

*Law of 1968* (1968-1969) 9 Santa Clara L.Rev. 75, 98 (Olson).) The principal drafters of these statutes have summarized their effect in this way: "There is no requirement under these sections that the plaintiff rely upon the statements or acts of the defendant or even that he be aware that the defendant made them or engaged in them. All that is required is that the plaintiff establish that the price which he paid or received was affected by the defendant's conduct or statements, which would of course assume that someone acted on the basis of the defendant's wrongful conduct. However, it is not necessary that the plaintiff prove that he personally was influenced by such conduct." (1 Marsh & Volk, Practice Under the Cal. Securities Law (1993) § 14.05[6], at p. 14-53, fn. omitted.)[10]

These statutory remedies, which do not require plaintiffs to plead or prove actual reliance, can be asserted in a class action. Accordingly, there is little force in plaintiffs' argument that we should reshape the law of deceit simply in order "to remove [an] unnecessary pleading barrier[] to the effective utilization of class action procedures." (Cf. *Children's Television, supra*, 35 Cal.3d at pp. 217-218 [to avoid an unreasonably lengthy complaint, plaintiffs may attach a representative selection of advertisements from a prolonged and extensive media campaign]; *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 875, fn. 10 [97 Cal.Rptr. 849, 489 P.2d 1113] [an inappropriately alleged class definition need not prevent class certification if the case in fact satisfies the prerequisites for certification].) The argument is misplaced in any event: Actual reliance is more than a pleading requirement; it is an element of the tort of deceit. As we have previously observed, "[c]lass actions are provided only as a means to enforce substantive law. Altering the substantive law to accommodate procedure would be to confuse the means with the ends—to sacrifice the goal for the going." (*City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 462 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223].)[11]

---

[10]Professor Harold Marsh, Jr., was the reporter for the committee that drafted the California Corporate Securities Law of 1968, which includes sections 25400 and 25500. Robert H. Volk was Commissioner of Corporations at that time.

[11]The same principle disposes of plaintiffs' argument that we should expand the law of fraud to afford them the benefit of other state procedural rules that they perceive as more favorable than the corresponding federal rules, such as: (a) the rule that the court may require the defendant to pay the cost of notice to the class (*Civil Service Employees Ins. Co.* v. *Superior Court* (1978) 22 Cal.3d 362, 374-381 [149 Cal.Rptr. 360, 584 P.2d 497]; cf. *Eisen* v. *Carlisle & Jacquelin* (1974) 417 U.S. 156, 177-179 [40 L.Ed.2d 732, 748-749, 94 S.Ct. 2140] [plaintiffs must bear the cost of notice]); (b) the rule that orders denying class certification are immediately appealable (*Richmond* v. *Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23]; cf. *Coopers & Lybrand* v. *Livesay* (1978) 437 U.S. 463, 468-477 [57 L.Ed.2d 351, 357-363, 98 S.Ct. 2454] [orders denying class certification not subject to interlocutory appeal]); and (c) the rule that plaintiffs can recover on a less-than-unanimous

Plaintiffs assert that their remedy under sections 25400 and 25500 is inadequate. It is true that liability under the sections is not precisely coextensive with liability under Rule 10b-5.[12] However, the state statutory remedy is not as limited as plaintiffs suggest. Contrary to plaintiffs' suggestion at oral argument, sections 25400 and 25500 do provide a remedy for fraud in connection with aftermarket transactions, i.e., resales of securities after they have been purchased from the issuing corporation in a public offering. To read the sections as imposing liability only in connection with issuer transactions is inconsistent with the statutory language, which broadly refers to "a broker-dealer *or other person* selling or offering for sale or purchasing or offering to purchase the security . . . ." (§ 25400, italics added.) Clearly the Legislature knew how to write a statute that addressed only issuer transactions when that was what it intended to do. (See § 25110 ["It is unlawful for any person to offer or sell in this state any security *in an issuer transaction* . . . ."], italics added.)

Nor is it correct, as plaintiffs also suggest, that liability under sections 25400 and 25500 requires privity of contract between the plaintiff and the defendant. The Legislature also knew how to write a statute that conditioned liability on privity. In section 25501 the Legislature did just that in these words: "Any person who violates Section 25401 *shall be liable to the person who purchases a security from him or sells a security to him* . . . ." (§ 25501, italics added.) Section 25500, in contrast, contains no such limitation; it provides more broadly that "[a]ny person who willfully participates in any act or transaction in violation of Section 25400 *shall be liable to any other person who purchases or sells any security* at a price which was affected by such act or transaction . . . ." (§ 25500, italics added.) In other words, "[u]nder Section 25501 the defendant is only liable to the person with whom he deals; whereas, under Section 25500 the defendant may be liable to any person trading in the market . . . ." (1 Marsh & Volk, *supra*, § 14.05[2][e], at p. 14-50; see also Olson, *supra*, 9 Santa Clara L.Rev. at p. 98.)

Plaintiffs point out that to incorporate the fraud-on-the-market doctrine into the common law of deceit would afford advantages beyond those that the relevant statutes provide, such as a longer limitations period and the right to recover punitive damages. ■ However, we have emphasized in recent decisions that courts "should be hesitant to 'impose [new tort duties] when to

jury verdict (Code Civ. Proc., § 618; cf. Fed. Rules Civ. Proc., rule 48 [requiring a unanimous verdict "[u]nless the parties otherwise stipulate"]).

[12]Contrary to the dissent's suggestion, we do not hold or imply that sections 25400 and 25500 "give plaintiffs the state equivalent of a rule 10b-5 action." (Dis. opn. of Kennard, J., *post*, p. 1122.) The state and federal remedies are alike in some respects and different in others. Nor do we necessarily endorse the dissent's other suggestions about how the state statutes should be interpreted.

do so would involve complex policy decisions' [citation], especially when such decisions are more appropriately the subject of legislative deliberation and resolution." (*Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120, 136 [271 Cal.Rptr. 146, 793 P.2d 479, A.L.R.4th 3659], quoting *Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 299 [253 Cal.Rptr. 97, 763 P.2d 948] [first set of brackets in original]; see also *Droeger* v. *Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 41 [283 Cal.Rptr. 584, 812 P.2d 931]; *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 694 & fn. 31 [254 Cal.Rptr. 211, 765 P.2d 373].) This admonition has particular force when the plea to expand liability concerns an area, such as securities fraud, in which the Legislature has already acted.

■ Indeed, the advantages that plaintiffs would obtain through expanded liability under the common law appear to conflict with several specific legislative policy choices.

Plaintiffs, for example, would prefer to sue under the law of deceit because the statute of limitations that applies to such claims is more favorable to plaintiffs than the limitation periods applicable to claims under state and federal securities law. (Compare Code Civ. Proc., § 338 [three years after discovery of the facts constituting a fraud], with Corp. Code, § 25506 [one year after discovery or four years after the act constituting the violation]; cf. *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson* (1991) __ U.S. __ [115 L.Ed.2d 321, 111 S.Ct. 2773] [adopting a one-year limitations period without equitable tolling for actions under Rule 10b-5].) However, the shorter limitations period in the Corporations Code was specifically intended to counterbalance the tremendous advantage that a presumption of reliance affords to plaintiffs. (*Bowden* v. *Robinson, supra,* 67 Cal.App.3d at p. 714.) Because the "statutory liabilities may in some instances be based on a lesser degree of fault than common law fraud, it is also important that businesses be freed from potential liabilities of indefinite duration in order that corporations may determine with some reasonable certainty what their financial situation is as of any given point of time. This is important not only to the corporation and its officers and directors but also to all of its shareholders and to persons generally interested in buying or selling its shares in the market." (1 Marsh & Volk, *supra,* § 14.08[1][a], at p. 14-66; cf. *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson, supra,* __ U.S. at p. __ [115 L.Ed.2d at p. 333, 111 S.Ct. at p. 2780] [observing that "policy considerations [are] implicit in any limitations provision"].)

Plaintiffs would also prefer to sue under the law of deceit because that law, in contrast to the applicable securities laws, permits an award of punitive damages. However, the failure of the securities laws to authorize punitive damages appears to reflect another deliberate policy choice.

While the courts of this state have not had occasion to comment on the reasons why the Legislature did not make punitive damages available, there is extensive commentary on the reasons why the federal judiciary has not made punitive damages available under Rule 10b-5. The state provisions were drafted and should be considered "in the light of this experience." (1 Marsh & Volk, *supra*, § 14.01[3], at p. 14-15.) In summary, the federal decisions reflect a longstanding consensus that "the burden on the securities business from punitive damages . . . outweigh[s] their contribution to enforcement of securities laws." (*Carras* v. *Burns* (4th Cir. 1975) 516 F.2d 251, 260; see also *Green* v. *Wolf Corporation*, *supra*, 406 F.2d 291, 303 & fn. 18; *Diaz Vicente* v. *Obenauer* (E.D.Va. 1990) 736 F.Supp. 679, 695; *Baumel* v. *Rosen* (4th Cir. 1969) 412 F.2d 571, 576.)

██ Punitive damages can be justified only as a deterrent measure or as retribution. ██ However, as the federal decisions explain, the additional deterrent value of punitive damages does not appear to be needed in this area for several reasons. The first reason is that actual damages, alone, represent a potentially crushing liability in securities fraud cases. (See *Green* v. *Wolf Corporation*, *supra*, 406 F.2d at p. 303 & fn. 18.) Under the fraud-on-the-market doctrine, which plaintiffs can invoke both under Rule 10b-5 and state securities law (§§ 25400, 25500), "the defendant may be liable to any person trading in the market for any length of time that the market price may have been affected by his misstatement." (1 Marsh & Volk, *supra*, § 14.05[2][e], at p. 14-50.) The second reason is that the class action mechanism, which makes litigation affordable for individuals, tends to ensure that the securities laws will be enforced. Because this procedural device "allow[s] many small claims to be litigated in the same action, the overall size of compensatory damages alone may constitute a significant deterrent." (*deHaas* v. *Empire Petroleum Company* (10th Cir. 1970) 435 F.2d 1223, 1231; *Green* v. *Wolf Corporation*, *supra*, 406 F.2d at p. 303.)

Nor is it clear that punitive damages are needed as a retributive measure. Both federal and state laws strongly express society's disapprobation of securities fraud through criminal sanctions. (15 U.S.C. § 78ff(a) [providing for imprisonment for up to 10 years and fines of up to $2.5 million]; §§ 25540, 25541 [providing for imprisonment for up to 5 years and fines of up to $250,000].) Federal and state laws also provide for civil penalties. (15 U.S.C. § 78ff(c); § 25535.)

There are, moreover, good reasons not to combine a cause of action that permits an award of punitive damages, such as common law deceit, with the fraud-on-the-market doctrine. An assessment of the defendant's culpability, for the purpose of setting punitive damages, would presumably take into

account the total effect of the defendant's misrepresentations on the market. However, plaintiffs may sue separately, and "if juries in several lawsuits are able to assess punitive damages against the same defendant for the same transaction, there is a danger of overkill." (*deHass* v. *Empire Petroleum Company, supra*, 435 F.2d at p. 1231.)

Also worth considering is the effect that the prospect of punitive damages might have on the settlement value of marginal claims. As the high court noted in a decision limiting the class of investors permitted to sue under Rule 10b-5, "[t]here has been widespread recognition that litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." (*Blue Chip Stamps* v. *Manor Drug Stores* (1975) 421 U.S. 723, 739 [44 L.Ed.2d 539, 551, 95 S.Ct. 1917] [*Blue Chip Stamps*].) The main reason for the difference is the fraud-on-the-market doctrine, which, by creating a presumption of reliance, both encourages the aggregation of claims and diminishes the plaintiff's burden of proof. In addition, "[t]he very pendency of the lawsuit may frustrate or delay normal business activity of the defendant which is totally unrelated to the lawsuit." (*Id.* at p. 740 [44 L.Ed.2d at p. 552].) As a result, "even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect for success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment." (*Ibid.*; cf. Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions* (1991) 43 Stan.L.Rev. 497 [arguing, based on an empirical study, that for practical purposes the settlement value of a securities fraud class action is not a function of merit].) To create a cause of action that would offer prospective plaintiffs both the advantage of a presumption of reliance *and* the prospect of recovering punitive damages could only exacerbate the problem.

▮ Finally, to incorporate the fraud-on-the-market doctrine into the law of deceit would permit plaintiffs to avoid two important limitations that the federal courts have imposed on market-reliance cases brought under Rule 10b-5. In such actions, a plaintiff must plead and prove, first, that he or she actually purchased or sold securities (*Blue Chip Stamps, supra*, 421 U.S. at pp. 730-755 [44 L.Ed.2d at pp. 546-560]) and, second, that the defendant had scienter—a degree of fault greater than negligence (*Ernst & Ernst* v. *Hochfelder* (1976) 425 U.S. 185, 194-215 [47 L.Ed.2d 668, 677-789, 96 S.Ct. 1375] [*Ernst & Ernst*]). These requirements of actions under Rule 10b-5, like the relatively short limitations period and the ban on punitive damages, reflect a deliberate effort, guided by judicial experience with securities fraud cases, to balance the advantages associated with a presumption of reliance against the danger of speculative and harassing claims. (See

*Blue Chip Stamps, supra*, 421 U.S. at pp. 738-749 [44 L.Ed.2d at pp. 550-557]; *Ernst & Ernst, supra*, 425 U.S. at p. 214, fn. 33 [47 L.Ed.2d at p. 689].) The same requirements, however, are not necessarily part of the common law of deceit. Thus, to permit common law claims based on the fraud-on-the-market doctrine would open the door to class action lawsuits based on exceedingly speculative theories. For example, unhindered by the *Blue Chip Stamps* and *Ernst & Ernst* rules, investors might sue on the ground that they missed favorable opportunities to buy or to sell securities because the market was affected by negligent misrepresentations that they never heard. Considering such prospects, we are reminded of the admonition that " 'the inexorable broadening of the class of plaintiff who may sue in this area of the law will ultimately result in more harm than good.' " (*Ernst & Ernst, supra*, 425 U.S. at pp . 214-215, fn. 33 [47 L.Ed.2d at p. 689], quoting *Blue Chip Stamps, supra*, 421 U.S. at pp. 747-748 [44 L.Ed.2d at pp. 555-556].)

In summary, to incorporate the fraud-on-the-market doctrine into the common law of deceit would only bring about difficulties that the state Legislature and the federal courts have apparently attempted to avoid. Nor would the proposed expansion of the common law of deceit offer benefits sufficient to offset the difficulties, since the state and federal securities laws already offer remedies that give plaintiffs the benefit of a presumption of reliance.[13] Under these circumstances, there is insufficient justification for upsetting the policy choices that the existing laws reflect. Accordingly, we decline to do so.

### DISPOSITION

The judgment of the Court of Appeal is affirmed.

Arabian, J., Baxter, J., George, J., and Turner, J.,* concurred.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the judgment only to the extent it declines to apply the fraud-on-the-market principle to claims for negligent misrepresentation. In all other respects, I dissent.

The fraud-on-the market principle embodies this logic: 1. In an open and developed securities market, the price of each security rapidly adjusts to reflect all public information that is material to the security's value. 2. When false information material to a security's value is made public, the security's

---

[13]Contrary to the dissent's suggestion (dis. opn. of Kennard, J., *post*, pp. 1121-1123), our analysis is not based in any way on the concept of preemption.

*Presiding Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chairperson of the Judicial Council.

price is thereby artificially inflated or depressed. 3. One who artificially inflates a security's price by intentionally disseminating material false information defrauds every person who, relying on the integrity of the market's price-setting mechanism, purchases the security at the artificially inflated price.

The United States Supreme Court has endorsed the fraud-on-the-market principle, and federal courts routinely apply it to compensate the victims of securities fraud in actions brought under federal securities laws. Because the fraud-on-the-market principle is a means of establishing actual although indirect reliance, and because it provides the investing public with needed protection against fraudulent manipulation of securities' prices, this court should recognize it as a valid method of pleading and proving reliance in an action for fraud.

I

This is a consolidated class action by shareholders of Maxicare Health Plans, Inc. (Maxicare) against Maxicare and certain of its directors, senior officers, underwriters, and accountants. The named plaintiffs purchased 1,400 shares of Maxicare common stock at various times between October 17, 1985, and February 29, 1988 (the class period). They sue on behalf of all persons, other than defendants, who purchased common stock or certain notes of Maxicare during the class period. Plaintiffs seek to recover damages, consisting of the loss of value of Maxicare securities, on theories including fraud and negligent misrepresentation. Because the case comes to this court after the sustaining of a demurrer, the allegations of the complaint, summarized below, are deemed true. (*Livitsanos* v. *Superior Court* (1992) 2 Cal.4th 744, 747 [7 Cal.Rptr.2d 808, 828 P.2d 1195].)

Maxicare is a publicly owned California corporation engaged in the nationwide operation of health maintenance organizations (HMO's). During the class period, it made public offerings of notes and common stock. Also during the class period, defendants made various public statements in reports to shareholders, federal securities filings, financial statements, audit reports, press releases, and other communications, in which they reported Maxicare's net earnings and assets; forecast in glowing terms its future business prospects; and extolled the virtues of its computerized financial, accounting, and management control system.

These public statements were materially false and misleading. Maxicare's net earnings and assets were less than represented; and toward the end of the class period, after acquiring two large HMO's for some $450 million,

Maxicare incurred heavy losses that defendants materially underreported. The discrepancies between the reported and true earnings resulted from failure to establish adequate reserves for medical costs, failure to promptly report and pay medical costs incurred, and failure to make timely write-downs of good will obtained in HMO acquisitions. Contrary to the public statements, Maxicare's computerized system of financial, accounting, and management controls was seriously defective and unable to effectively anticipate, provide for, or contain the rapidly increasing costs of medical care, or to integrate the newly acquired HMO's. Each defendant either knew that the public statements were false, recklessly disregarded information indicating the statements' falsity, or made the statements negligently and carelessly, without reasonable grounds for believing them to be true.

Knowing that their public statements would directly affect the offering and aftermarket prices of Maxicare's publicly traded securities, defendants made these "false positive" statements and omissions, or assisted or permitted other defendants to make them, for the purpose and with the effect of manipulating and inflating the prices of the Maxicare notes and common stock and inducing public investors to purchase these Maxicare securities. As a result of the false positive statements, Maxicare notes and common stock traded on the national over-the-counter market (NASDAQ) during the class period at prices up to $1,000 per note and $28½ per share. When the true state of affairs became publicly known, the price of Maxicare notes plunged and its common stock fell to $1½ per share. In the interim, while Maxicare's internal problems were known to defendants but not publicly disclosed, certain of the defendants liquidated their own holdings of over 273,000 shares of Maxicare common stock, receiving proceeds from the sales in excess of $4.6 million.

Plaintiffs were ignorant of the adverse facts concerning Maxicare's business and financial condition. "In reliance upon the integrity of the securities market and the securities offering process, and the fidelity and integrity and superior knowledge of defendants, and in ignorance of the true facts, plaintiffs and other members of the Plaintiff class were induced to and did purchase Maxicare securities." Had plaintiffs known that defendants had publicly misstated and failed to disclose material information, they would not have purchased Maxicare securities at the artificially inflated prices. As a result of defendants' conduct, plaintiffs suffered injury by the loss of value of their investments in Maxicare securities.

II

Reliance is an essential element of a fraud cause of action. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108 [252 Cal.Rptr. 122, 762 P.2d 46];

*Brown* v. *Superior Court* (1988) 44 Cal.3d 1049, 1070-1071 [245 Cal.Rptr. 412, 751 P.2d 470]; *Vai* v. *Bank of America* (1961) 56 Cal.2d 329, 352 [15 Cal.Rptr. 71, 364 P.2d 247].) Thus, the issue presented is not whether reliance is an element of fraud, but what a plaintiff must allege and prove to establish that element.

In an action for fraud, reliance is proved by showing that the defendant's misrepresentation or nondisclosure was "an immediate cause" of the plaintiff's injury-producing conduct. (*Molko* v. *Holy Spirit Assn.*, *supra*, 46 Cal.3d 1092, 1108.) A plaintiff may establish that the defendant's misrepresentation is an "immediate cause" of the plaintiff's conduct by showing that in its absence the plaintiff "in all reasonable probability" would not have engaged in the injury-producing conduct. (*Ibid.*) As the following authorities establish, a defendant's misrepresentation may be an "immediate cause" of a plaintiff's injury-producing conduct even though the defendant did not make the misrepresentation directly to the plaintiff, and even though the plaintiff never heard or read the precise words of the misrepresentation.

The Restatement Second of Torts states the principle of indirect reliance this way: "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his [or her] conduct in the transaction or type of transaction involved." (Rest.2d Torts, § 533.)

Consistent with the Restatement position, this court has long recognized that a representation may be actionable even though it was not made directly to the party seeking recovery. (*American T. Co.* v. *California etc. Ins. Co.* (1940) 15 Cal.2d 42, 67 [98 P.2d 497]; *Crystal Pier Amusement Co.* v. *Cannan* (1933) 219 Cal. 184, 188 [25 P.2d 839, 91 A.L.R. 1357]; *Hunter* v. *McKenzie* (1925) 197 Cal. 176, 185 [239 P. 1090].) A misrepresentation is no less actionable, our courts have held, because it was originally made to an intermediary who conveyed it to the party ultimately injured. (*Varwig* v. *Anderson-Behel Porsche/Audi, Inc.* (1977) 74 Cal.App.3d 578, 580 [141 Cal.Rptr. 539]; *Massei* v. *Lettunich* (1967) 248 Cal.App.2d 68, 73 [56 Cal.Rptr. 232]; *Harold* v. *Pugh* (1959) 174 Cal.App.2d 603, 608 [345 P.2d 112]; *Roberts* v. *Salot* (1958) 166 Cal.App.2d 294, 300 [333 P.2d 232]; *Simone* v. *McKee* (1956) 142 Cal.App.2d 307, 313-314 [298 P.2d 667]; *Wice* v. *Schilling* (1954) 124 Cal.App.2d 735, 745 [269 P.2d 231].) Thus, for example, one who misrepresents the soundness of an investment to one potential investor, knowing that this person is likely to repeat the remarks to

other potential investors, is liable to one who receives the misinformation in this fashion, acts upon it, and suffers loss. (*Strutzel* v. *Williams* (1952) 109 Cal.App.2d 512, 515 [240 P.2d 988]; see also *Nathanson* v. *Murphy* (1955) 132 Cal.App.2d 363, 368-369 [282 P.2d 174].)

Nor is it necessary that the intermediary transmit the misrepresentation verbatim. Rather, the misrepresentation remains actionable even though the intermediary has paraphrased or summarized it, or even transformed it from an assertion of fact into a rating, certification, or recommendation. A comment to section 533 of the Restatement Second of Torts illustrates this point: "One of the situations to which the rule stated in this Section is frequently applied is where misrepresentations are made to a credit-rating company for the purpose of obtaining a credit rating based on them. In this case the maker is subject to liability to any person who may be expected to and does extend credit to him in reliance upon the erroneous rating so procured. *The fact that the rating company does not communicate the figures misstated by the maker of the misrepresentations is immaterial. It is enough that their substance is summarized with reasonable accuracy or that the rating given expresses the effect of the misstatements made.*" (Rest.2d Torts, § 533, com. f, pp. 74-75, italics added.) Thus, the Restatement recognizes that when a fraudulent statement has been transformed into and become embedded in a credit rating, the maker of the misrepresentation is liable for fraud to persons who rely on the rating in extending credit.

Courts have applied this concept of indirect reliance in a variety of situations. In one case, an airplane manufacturer was alleged to have made misrepresentations to the Federal Aviation Administration (FAA) to obtain certification of a particular aircraft. A purchaser of the aircraft was held to have stated a valid claim against the manufacturer for fraudulent misrepresentation by alleging reliance on the FAA certification in making the decision to purchase. (*Learjet Corp.* v. *Spenlinhauer* (1st Cir. 1990) 901 F.2d 198, 200-202.) In so holding, the federal court recognized, in effect, that reliance on the FAA certification was reliance on the manufacturer's misrepresentations, because the misrepresentations had become embedded in the certification. Or, in the language of the Restatement comment, the certification expressed the effect of the manufacturer's misrepresentations.

Courts in California and other states have applied the principle of indirect reliance to the situation in which a manufacturer of a prescription drug or medical device has misrepresented its product's safety and effectiveness to the medical profession. A patient injured by the drug or device is permitted to sue the manufacturer for fraud without proof that the doctor who prescribed the drug or recommended the device repeated the misrepresentations

to the patient. (*Allen* v. *G.D. Searle & Co.* (D.Or. 1989) 708 F.Supp. 1142, 1160-1161; *Tetuan* v. *A.H. Robins Co.* (1987) 241 Kan. 441 [738 P.2d 1210, 1227-1228]; *Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 441 [79 Cal.Rptr. 369]; *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 707 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) These courts have concluded, in effect, that a patient's reliance on the learning and integrity of the physician constitutes reliance on the manufacturer's misrepresentations, because the misrepresentations have become embedded in the physician's prescription or recommendation to the patient.

The intermediary that conveys the misrepresentation to the party injured by it need not be an individual or a governmental entity. It can be the price-setting mechanism of a developed market, as shown by *In re Equity Funding Corp. of Amer. Sec. Litigation* (C.D.Cal. 1976) 416 F.Supp. 161, an action filed in federal court in which the plaintiffs alleged claims under both federal and California law. In discussing the pendent California claims, the federal district court judge, now Chief Justice of this court, reasoned as follows: "Under California law, in order to recover for fraud, plaintiffs must show that they relied to their detriment on the material misrepresentation(s) of the defendants. [Citations.] The plaintiffs have alleged the reliance element necessary to sustain a fraud claim under California law against these defendants. In Paragraph 22(d)(1) of the Complaint, for example, it is alleged these defendants and others disseminated EFCA [Equity Funding Corporation of America] and EFLIC [Equity Funding Life Insurance Company] financial statements 'for the purpose and with the effect of influencing and manipulating the price of Equity Funding securities and for the purpose and with the effect of influencing open market purchasers of EFCA securities to purchase such securities.' In Paragraphs 22(d)(2) and (3) the 'purpose and effect' allegation is repeated as it pertains to the debenture purchasing plaintiffs . . . . *This allegation of 'purpose and effect,' coupled with the clear materiality of the misrepresentations alleged, satisfies the reliance and causation requirements imposed on pleadings that assert fraud claims in California.*" (*Id.* at pp. 182-183, italics added.)

One final "intermediary" case deserves mention. In *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197 [197 Cal.Rptr. 783, 673 P.2d 660], the plaintiffs asserted a claim for fraud against a cereal manufacturer, a retailer and two advertising agencies, alleging deceptive advertising for sugared breakfast cereals. (*Id.* at pp. 204-205.) The defendants demurred, contending that the complaint was deficient because it alleged that children were exposed to the advertising and that parents purchased the cereals. The defendants argued that the parents could not have relied on misrepresentations that had not been made to them. (*Id.* at p. 219.)

This court rejected the position that it was essential to allege either that the misrepresentations had been made directly to the parents or that the children had repeated the misrepresentations to their parents. This court stated that such repetition "should not be a prerequisite to liability; it should be sufficient that defendant makes a misrepresentation to one group intending to influence the behavior of the ultimate purchaser, and that he succeeds in this plan." (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d 197, 219.)

By holding that the plaintiffs' pleading of reliance was sufficient, we recognized that the alleged misrepresentations had become embedded in the children's cereal preferences, which the children then communicated to the parents, and that in expressing these preferences, the children were, in the language of the Restatement comment, expressing the effect of the misrepresentations. (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d 197, 219.)

As this review of pertinent case law demonstrates, the principle of indirect reliance makes an intentional misrepresentation actionable even though the falsehood's originator did not speak it directly to the injured party. Liability for fraud attaches when the originator's falsehood has been conveyed to the injured party by an intermediary in a form that substantially expresses the effect of the falsehood, and the injured party has relied upon the falsehood as so conveyed. In the context of a developed securities market, the impersonal price-setting mechanism, which constantly adjusts the trading prices of securities in response to public disclosures of material information, is such an intermediary.

Because it adjusts rapidly to reflect material public information, in the same way that a credit rating is adjusted to reflect material information, the price of an openly traded security may express the effect of a fraudulent statement. For this reason, reliance on a fraudulently manipulated market price, like reliance on a fraudulently inflated credit rating, is equivalent in law to direct reliance on the original fraudulent statement. This, in summary, is what federal courts mean by fraud on the market.

The fraud-on-the-market principle was developed in the context of federal securities law, which provides a variety of private remedies to preserve and enhance the integrity of public securities markets. Of particular interest to the issue in this case, federal law permits a person injured by fraudulent manipulation of the price of a publicly traded security to recover damages under section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C.

§ 78j(b)[1]) and administrative rule 10b-5 of the Securities and Exchange Commission (17 C.F.R. § 240.10b-5 (1992)[2]). In such actions (hereafter rule 10b-5 actions), federal courts routinely apply the fraud-on-the-market principle to permit those who have purchased a security at artificially inflated prices to recover damages without proving that they were aware of the specific false information by which the security's price was manipulated.

The first appellate decision to articulate the fraud-on-the-market principle was *Blackie* v. *Barrack* (9th Cir. 1975) 524 F.2d 891, in which the court held that "proof of subjective reliance on particular misrepresentations is unnecessary to establish a 10b-5 claim for a deception inflating the price of stock traded in the open market." (*Id.* at p. 906.) The court explained the holding this way: "A purchaser on the stock exchanges may be either unaware of a specific false representation, or may not directly rely on it; he may purchase because of a favorable price trend, price earnings ratio, or some other factor. Nevertheless, he relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, *and thus indirectly on the truth of the representations underlying the stock price—whether he is aware of it or not, the price he pays reflects material misrepresentations.* Requiring direct proof from each purchaser that he relied on a particular representation when purchasing would defeat recovery by those whose reliance was indirect, despite the fact that the causational chain is broken only if the purchaser would have purchased the stock even had he known of the misrepresentation. We decline to leave such open market purchasers unprotected." (*Id.* at p. 907, italics added.)

The United States Supreme Court approved the fraud-on-the-market principle in *Basic Inc.* v. *Levinson* (1988) 485 U.S. 224 [99 L.Ed.2d 194, 108

---

[1]"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

". . . . . . . . . . . . . . . . . . . . .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." (15 U.S.C. § 78j.)

[2]"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security." (17 C.F.R. § 240.10b-5.)

S.Ct. 978]. After noting that reliance was an element of a rule 10b-5 action, the court explained its approval of the principle in these words: "Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations. It has been noted that 'it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?' [Citation.] Indeed, nearly every court that has considered the proposition has concluded that where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed. Commentators generally have applauded the adoption of one variation or another of the fraud-on-the-market theory. An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." (*Id.* at pp. 246-247 [99 L.Ed.2d at p. 218], fns. omitted.)

The fraud-on-the-market principle has not been limited to rule 10b-5 actions. Although it is true, as the majority points out, that as yet no state appellate court has applied the fraud-on-the-market logic in an action for fraud, federal courts have applied fraud-on-the-market reasoning to pendent fraud claims under the laws of other states. (*In re Healthcare Services Group, Inc. Securities Litigation* (E.D.Pa. 1993) Fed. Sec. L. Rep. (CCH) ¶ 97,374, pp. 95,978-95,979 [Pa. law]; *Hurley* v. *Federal Deposit Ins. Corp.* (D.Mass. 1989) 719 F.Supp. 27, 34, fn. 4 [Mass. law]; *Minpeco, S.A.* v. *Hunt* (S.D.N.Y. 1989) 718 F.Supp. 168, 175-177 [N.Y. law].) When these federal decisions applying state law are compared with the two state appellate decisions cited by the majority that decline to apply fraud-on-the-market logic to actions for fraud, the count of decisions under the laws of other states in this still relatively undeveloped area of the law reveals a roughly even split.

As this review of the relevant authorities demonstrates, the fraud-on-the-market principle that the federal courts developed in rule 10b-5 cases is fully consistent with the Restatement Second of Torts and with California law. In actions for intentional misrepresentation, our law has never required direct or "eyeball" reliance to sustain a claim, but has recognized the principle of indirect reliance, under which a fraudulent statement is no less actionable because it has passed through an intermediary and in the process has undergone a change in form before inducing reliance by a party who thereby suffers injury. The price of a security traded in an open and developed

market may express the effect of a fraudulent statement just as surely as a credit rating (Rest.2d Torts, § 533, com. f), governmental certification (*Learjet Corp.* v. *Spenlinhauer, supra,* 901 F.2d 198), doctor's prescription (*Allen* v. *G.D. Searle & Co., supra,* 708 F.Supp. 1142), or even a child's importuning of a parent to purchase a particular breakfast cereal (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d 197). In all such cases, the chain of causation is unbroken, and the element of reliance is established.

### III

To explain its refusal to accept the fraud-on-the-market logic as a means of proving reliance in traditional tort actions for fraud, the majority dismisses this method of proof as establishing "presumed reliance" rather than "actual reliance." (Maj. opn., *ante,* p. 1097.) Two errors underlie this explanation. First, the majority restricts the concept of indirect reliance, which it approves in principle, in a manner at odds with the case law and with the Restatement Second of Torts. Second, the majority misunderstands the context in which federal courts have presumed reliance in rule 10b-5 actions.

The majority professes approval of the principle of indirect reliance as stated in section 533 of the Restatement Second of Torts and as applied in some California cases. But the majority imposes its own novel and restrictive interpretation on this principle. The majority does this by conferring the mantle of "actual reliance" only upon those indirect reliance situations in which an intermediary has conveyed the original misrepresentation by paraphrase, summary, or verbatim repetition. The majority appears to exclude from the category of "actual reliance" those situations in which an intermediary has conveyed the misrepresentation in the form of a rating, certification, recommendation, or market price.

Restricting the principle of indirect reliance in this manner is flatly inconsistent with comment f of section 533 of the Restatement Second of Torts and with cases I have previously cited. Rather than acknowledging this conflict, however, the majority discusses the relevant authorities in a way that conceals their significance.

For example, comment f states that one whose misrepresentations have artificially inflated a credit rating is liable in fraud for damages incurred through reliance on the rating even though "the rating company does not communicate the figures misstated by the maker." Instead of recognizing that this comment rejects the very limitation that the majority imposes on the

principle of indirect reliance, the majority dismisses the Restatement comment with this impenetrable remark: "While the misrepresentation in such a case need not be communicated verbatim, the defendant is liable only to a plaintiff 'who acts in justifiable reliance upon it . . . .' " (Maj. opn., *ante,* p. 1096, fn. 5.)

No less opaque is the majority's treatment of the federal court opinion in *Learjet Corp.* v. *Spenlinhauer, supra,* 901 F.2d 198, which held that an airplane purchaser had satisfied the reliance element of fraud by pleading reliance upon a federal agency's certification as an expression of misrepresentations that the airplane's manufacturer had made to the certifying agency. The majority would distinguish *Learjet* on the basis that a government certification "necessarily implies that the particular representations required to obtain the certification have been made," whereas the market price of a security traded on an open and developed market "necessarily implies only that some buyer is willing to pay the quoted price." (Maj. opn., *ante,* p. 1100, fn. 6.) Yet elsewhere the majority concedes that the trading prices of securities adjust in response to the dissemination of material information. (*Id.* at p. 1101.) Thus, the price of a corporation's securities expresses material representations about the corporation's financial health and prospects in the same way that a government certification of an aircraft expresses material representations about the physical integrity and soundness of that aircraft.

The majority is abrupt in its dismissal of cases holding that one who has been injured by a prescription drug or similar product may sue the manufacturer for fraud even though the fraudulent statements were made, not to the injured person, but to the doctor who prescribed or administered the product. The majority asserts that these cases "do not assist" plaintiffs "because the courts that decided the cases expressly relied on agency principles rather than the concept of a fraud on the market." (Maj. opn., *ante,* p. 1097.) True, California decisions addressing this situation have alluded to agency, but in this context agency is nothing but an awkward legal fiction. Most patients would no doubt be surprised to learn that they have appointed their doctors as agents for dealings with manufacturers of pharmaceutical products. If the concept of agency is really this expansive, one could also conclude, just as easily, that those who use the services of credit rating companies have appointed the companies as their agents for the purpose of gathering and processing information material to the credit rating, that aircraft purchasers have appointed the federal government as their agent for the purpose of gathering and processing information material to the soundness of airplanes, or that an open and developed securities market acts as the agent of investors for the purpose of gathering and processing information material to the value

of openly traded securities. Not surprisingly, courts in other jurisdictions have not resorted to the concept of agency to justify imposing fraud liability on pharmaceutical manufacturers who have misrepresented their products to the medical profession. (See *Allen* v. *G.D. Searle & Co., supra*, 708 F.Supp. 1142, 1160-1161; *Tetuan* v. *A.H. Robins Co., supra*, 241 Kan. 441 [738 P.2d 1210, 1227-1228].) In my view, the principle that best explains the pharmaceutical company's fraud liability is indirect reliance, not agency.

The majority's imperceptive treatment of precedent is revealed most clearly by its discussion of *Committee on Children's Television, Inc.* v. *General Foods Corp., supra*, 35 Cal.3d 197, the fraud action based on allegedly deceptive advertising for sugared breakfast cereals. There, as I have already explained, this court permitted parents who had purchased the cereals for their children to maintain the fraud suit even though the complaint did not allege that the parents had heard any of the advertising. As the majority here acknowledges, this court expressed its conclusion in these terms: "[P]laintiffs do not allege the children repeated the representations to their parents, and we would imagine that in most cases they did not, but simply expressed their desire for the product. Repetition, however, should not be a prerequisite to liability; it should be sufficient that defendant makes a representation to one group intending to influence the behavior of the ultimate purchaser, and that he succeeds in this plan." (*Id.* at p. 219.)

Incredibly, the majority interprets this statement as meaning only "that children cannot be expected to convey representations about products with precision." (Maj. opn., *ante*, p. 1099.) The opinion's language simply will not bear this meaning. The dispute was not about precision or imprecision in the children's repetition of the alleged misrepresentations. This court assumed for purposes of argument that the children did not repeat the misrepresentations at all in their original form, but only in the form of an expressed desire for the product. Having made this assumption, a majority of this court concluded that the parents could maintain their action for fraud against the makers of the alleged misrepresentations. This conclusion cannot be reconciled with the majority's restrictive notion of indirect reliance. Rather, it supports plaintiffs' position in this case that reliance on a preference, rating, prescription, certification, recommendation, or any comparable embodiment of a misrepresentation satisfies the reliance requirement in an action for fraud.

The majority also fails to acknowledge that *Blackie* v. *Barrack, supra*, 524 F.2d 891, the pioneering federal decision applying the fraud-on-the market logic to rule 10b-5 actions, places fraud on the market squarely within the framework of the indirect reliance principle. To demonstrate the point, I

once again quote the relevant language, this time more tightly edited to focus on the relevant issue: "A purchaser on the stock exchanges may be either unaware of a specific false representation, or may not directly rely on it . . . . Nevertheless, he relies generally on the supposition that the market price is validly set . . . *and thus indirectly on the truth of the representations underlying the stock price*—whether he is aware of it or not, the price he pays reflects material misrepresentations. Requiring direct proof from each purchaser that he relied on a particular representation when purchasing would defeat recovery *by those whose reliance was indirect* . . . ." (*Id.* at p. 907, italics added.)

This quotation, which shows that fraud on the market belongs squarely within the framework of indirect reliance, leads to consideration of the second error underlying the majority's reasoning: the majority's reliance on federal authority for the proposition that the reliance established by means of the fraud-on-the-market logic is presumed reliance rather than actual reliance.

To be sure, federal courts speak of a "presumption of reliance" in fraud-on-the-market cases, and it is this language that the majority has taken out of context and seized upon. The context in which federal courts presume reliance in fraud-on-the-market cases is class certification, a stage of the proceedings that this case has never reached. Federal courts do not employ a presumption of reliance to determine the existence of a cause of action.

In *Basic Inc.* v. *Levinson, supra,* 485 U.S. 224, for example, the United States Supreme Court's references to a presumption of reliance under the fraud-on-the-market doctrine all occurred in the context of class certification. The court framed the issue as "whether the courts below properly applied a presumption of reliance in certifying the class . . . ." (*Id.* at p. 230 [99 L.Ed.2d at p. 207].) The court observed that "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action . . . ." (*Id.* at p. 242 [99 L.Ed.2d at p. 215].) Holding that the presumption of reliance had been properly applied, the court mentioned that "nearly every court that has considered the proposition has concluded that where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." (*Id.* at p. 247 [99 L.Ed.2d at p. 218].)

Because this action has never reached the class certification stage, this court is not called upon to decide whether each plaintiff should be required

to testify individually to reliance on the integrity of the market price, or whether reliance by all plaintiffs in the class might be presumed or inferred. (See *Occidental Land, Inc.* v. *Superior Court* (1976) 18 Cal.3d 355, 363 [134 Cal.Rptr. 388, 556 P.2d 750] [where same representation is made to each class member, who thereafter takes action consistent with reliance, reliance may be inferred]; *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 814 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513] [same].) The only issue is the existence of a cause of action for fraud. For this purpose, as previously explained, the fraud-on-the-market logic developed by the federal courts does not require the use of any presumption.

Thus, the majority is wrong when it insists that the reliance proved by the method known as fraud on the market is something other than actual reliance. No presumption is needed to prove through this method that one who has purchased a security at an artificially inflated price, believing that the price-setting mechanism is untainted, has indirectly relied on the public misrepresentations that caused the price distortion. As one federal court remarked, "reliance on the market price is conceptually indistinguishable from reliance upon representations made in face-to-face transactions." (*In re LTV Securities Litigation* (N.D.Tex. 1980) 88 F.R.D. 134, 142.) The majority insists that fraud on the market is analytically distinct from other forms of indirect reliance, but it is just not so.

## IV

In part II.B. of its opinion, the majority decides against "changing the law by incorporating the fraud-on-the-market doctrine." (Maj. opn., *ante*, p. 1100.) The majority does so largely on the grounds that the victims of fraudulent stock market practices have adequate remedies under federal and state securities laws, and that recognizing an additional remedy under the traditional tort cause of action for fraud would somehow interfere or conflict with those securities laws.

As I have shown, this part of the majority opinion proceeds from a mistaken premise. Recognizing fraud on the market as a method of pleading and proving reliance in actions for fraud does not require a change in California law, but merely an application of existing common law principles expressed in the indirect reliance cases from California and other jurisdictions, and in the Restatement Second of Torts. But this mistaken premise— that recognizing fraud on the market requires a change in the law—is not the only defect in this part of the majority opinion. In purporting to find a conflict between the traditional tort action for fraud and the more specific

remedies provided under federal and state securities laws, the majority is questioning the wisdom of Congress and our state Legislature.

Federal law at present affords victims of securities fraud a remedy through a rule 10b-5 action. But this federal cause of action was never intended to exclude any state remedies: "Congress expressly provided against any implication that it intended to pre-empt the field by declaring, in section 28(a) of the Securities Exchange Act of 1934 (48 U.S. Stat. 903), that '[t]he rights and remedies provided by this title shall be in addition to any and all other rights and remedies that may exist at law or in equity.'" (*Diamond* v. *Oreamuno* (1969) 24 N.Y.2d 494, 504 [301 N.Y.S.2d 78, 85, 248 N.E.2d 910, 915].) Because federal securities laws are cumulative to, and not exclusive of, state remedies, federal law is not offended or frustrated when, for example, federal courts in rule 10b-5 actions award punitive damages on pendent state fraud claims. (See, e.g., *Halling* v. *Hobert & Svoboda, Inc.* (E.D.Wis. 1989) 720 F.Supp. 743, 746.) Congress understood and respected the substantial interests of the states in maintaining effective state remedies to deter intentional wrongdoing within their borders, and in assuring full and effective compensation to state residents who have been the victims of such intentional wrongdoing.

Is there an adequate state remedy under California securities law? The majority confidently assures plaintiffs that they have a remedy under the Corporate Securities Act of 1968 (Corp. Code, § 25000 et seq.). Specifically, the majority locates this remedy in section 25400, subdivision (d)[3] (hereafter section 25400(d)), and section 25500[4] of the Corporations Code.

As the majority points out, liability under these state securities law provisions encompasses both issuer and aftermarket transactions, without

---

[3]"It is unlawful for any person, directly or indirectly, in this state:

" . . . . . . . . . . . . . . . . . . . .

"(d) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he [or she] knew or had reasonable ground to believe was so false or misleading." (Corp. Code, § 25400.)

[4]"Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction. Such damages shall be the difference between the price at which such other person purchased or sold securities and the market value which such securities would have had at the time of his [or her] purchase or sale in the absence of such act or transaction, plus interest at the legal rate." (Corp. Code, § 25500.)

proof of either privity of contract or direct reliance by the plaintiff. This would suggest that these provisions give plaintiffs the state equivalent of a rule 10b-5 action. At least, this is what the majority implies.

The principal limitation of section 25400(d) as a general remedy for securities fraud appears to be the requirement that the party making the misrepresentation be a "broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security." To satisfy this requirement, the plaintiff must prove that the defendant was engaged in market activity at the time of the misrepresentations. (1 Marsh & Volk, Practice Under the Cal. Securities Laws (1993) § 14.05[4], p. 14-52.) Giving this limitation a strict construction, at least one federal court has held that when a corporation sells its stock through underwriters (as the complaint alleges in this case), the corporation and its officers are not sellers and therefore are not bound by section 25400(d). (*In re Activision Securities Litigation* (N.D.Cal. 1985) 621 F.Supp. 415, 422.) But the majority's assurance that plaintiffs have a remedy under 25400(d) must mean that it disagrees with this restrictive construction.

In any event, the availability of a state securities law remedy is no more persuasive than the availability of a federal remedy as a justification for shutting the door to the traditional action for fraud. The primary purpose of our state's corporate securities law is to protect the innocent investing public from fraudulent and manipulative practices. (*Southern Cal. First Nat. Bank* v. *Quincy Cass Associates* (1970) 3 Cal.3d 667, 675 [91 Cal.Rptr. 605 [478 P.2d 37]; *People* v. *Baumgart* (1990) 218 Cal.App.3d 1207, 1220 [267 Cal.Rptr. 534].) To provide the fullest measure of protection, the Corporate Securities Act of 1968 declares that none of its provisions "shall limit any liability which may exist by virtue of any other statute or under common law if this law were not in effect." (Corp. Code, § 25510.) In other words, our state's securities laws, like the federal securities laws, were intended to supplement, not replace, other statutory and common law remedies. (*Bowden* v. *Robinson* (1977) 67 Cal.App.3d 705, 716 [136 Cal.Rptr. 871].) To speak, as the majority does, of a "conflict" between securities law remedies and the traditional action for fraud is to ignore the decisions of our state Legislature and Congress to make securities laws nonexclusive and cumulative to traditional tort remedies (see Corp. Code, § 25510; 15 U.S.C. § 78bb(a)).

V

I agree with the majority that liability under the fraud-on-the-market principle should not extend to negligent misrepresentation. This court has

recognized that liability should be broader for actual fraud than for negligent misrepresentation. (See, e.g., *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 415 [11 Cal.Rptr.2d 51, 834 P.2d 745].) We have emphasized that when a defendant's misconduct is not intentional, but merely negligent, foreseeability of harm may not provide a sufficient limit on the scope of liability (*id.* at p. 399), and that the liability imposed should not be grossly disproportionate to the moral fault of the negligent party (*id.* at pp. 399-402).

As set forth earlier, the fraud-on-the-market principle has been articulated and developed in the context of rule 10b-5 actions. To recover in an action under rule 10b-5, a party who has purchased a security at an artificially inflated price must prove scienter. For purposes of a rule 10b-5 claim, scienter means an "intent to deceive, manipulate, or defraud," and does not include mere negligence. (*Ernst & Ernst* v. *Hochfelder* (1976) 425 U.S. 185, 193, 214 [47 L.Ed.2d 668, 688-689, 96 S.Ct. 1375].) Thus, the principle of fraud on the market, as its name implies, was developed for use in actions involving intentional wrongdoing, not mere negligence.

In actions involving negligence or negligent misrepresentation, courts must balance competing concerns. Liability should be sufficient to provide an incentive for due care and to compensate those most directly injured by an absence of care, but should not be so great that it is grossly disproportionate to fault or discourages participation in socially valuable endeavors. In the context of securities transactions, liability should be sufficient to promote care in the release of information material to the value of publicly traded securities, and to provide compensation to at least the most immediate victims of inaccurate information. But the liability should not be so broad as to discourage businesses from using public markets to accumulate capital.

Here, the balance would be most appropriately struck by limiting recovery for negligent misstatements to those who have received and relied upon the misstatements directly, and excluding those who have relied indirectly through the market-set price.

## VI

To drive up the value of a security by means of knowingly false public statements is actual fraud. Innocent investors who purchase the security at the inflated price in ignorance of the falsehood suffer actual loss when the falsehood is revealed and the value of the security declines. When these actual victims of actual fraud seek compensation for actual losses, it requires

no revolution in judicial thinking to hold that the traditional tort action for fraud provides a remedy. In rejecting the fraud-on-the-market method of proving reliance in actions for fraud, the majority repudiates existing law as expressed in the indirect reliance cases. I dissent from the majority's decision to withhold the traditional fraud remedy from those wronged by intentional manipulation of securities prices.

Mosk, Acting C. J., concurred.